648 F.2d 879
 1981-1 Trade Cases 63,985
 TOSE, Leonard H., Philadelphia Eagles Football Club, Tose,
Inc., Appellants in No. 80-2123,
v.
FIRST PENNSYLVANIA BANK, N.A.; Bunting, John R.; Pemberton,
John C.; Barness, Herbert; Forstater, Sidney; Provident
National Bank, Chase Manhattan Bank, N.C., Girard Bank,
Philadelphia National Bank, and Firestone, John D.
TOSE, Leonard H., Philadelphia Eagles Football Club, Tose, Inc.,
v.
FIRST PENNSYLVANIA BANK, N.A.; Bunting, John R.; Pemberton,
John C.; Barness, Herbert; Forstater, Sidney; Provident
National Bank, Chase Manhattan Bank, N.C., Girard Bank,
Philadelphia National Bank, and Firestone, John D.
Appeal of Sidney FORSTATER in No. 80-2334.
 Nos. 80-2123, 80-2334.
 United States Court of Appeals,
Third Circuit.
 Argued March 19, 1981.
Decided April 30, 1981.
Rehearing and Rehearing In Banc Denied May 27, 1981.
 
 Joseph L. Alioto (argued), Alioto & Alioto, San Francisco, Cal., Susan T. Fletcher (argued), West Chester, Pa., Gerald F. Tietz, Arthur L. Pressman, Abraham, Pressman, Tietz & Seidman, P.C., Philadelphia, Pa., for appellants.
 John M. Elliott (argued), Stephen L. Friedman, Thomas J. Elliott, Henry F. Siedzikowski, Dilworth, Paxson, Kalish & Levy, Philadelphia, Pa., for appellee John R. Bunting.
 Tom P. Monteverde (argued), Jean C. Hemphill, Monteverde, Hemphill & Maschmeyer, Philadelphia, Pa., for appellees First Pennsylvania Bank, N.A. and John C. Pemberton.
 Thomas B. Rutter (argued), Thomas B. Rutter, Ltd., Philadelphia, Pa., for appellee Sidney Forstater.
 Tyson W. Coughlin (argued), Michael L. Lehr, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellee Provident Nat. Bank.
 Patrick T. Ryan (argued), Kathleen M. Lynch, Drinker Biddle & Reath, Philadelphia, Pa., Edward J. Reilly, Peter A. Copeland, Milbank, Tweed, Hadley & McCloy, New York City, for appellee Chase Manhattan Bank, N.A.
 Arthur E. Newbold, IV (argued), Jean Wegman Burns, Dechert, Price & Rhoads, Philadelphia, Pa., for appellee Girard Bank.
 Benjamin W. Quigg, Jr. (argued), James J. Rodgers, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee Philadelphia National Bank.
 Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and MARKEY, Chief Judge.*
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The major question for decision is whether the district court erred in granting summary judgments and directed verdicts in favor of a number of institutional and individual defendants against whom antitrust and other claims had been brought by Leonard Tose, Tose, Inc., and the Philadelphia Eagles Football Club. We also consider issues arising from contractual counterclaims filed by an individual defendant. We find no error in the district court's disposition, and therefore we will affirm.
 
 I.
 
 2
 Appellants filed suit in the district court on May 5, 1978, against appellees First Pennsylvania Bank (FPB), John Bunting, John Pemberton, Sidney Forstater, and Provident, Chase, Girard, and Philadelphia National banks, and against Herbert Barness and John Firestone. An amended complaint was filed by leave of the court on July 2, 1979, setting forth four distinct claims for relief against various defendants: count one, a conspiracy in restraint of trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, designed to "force Tose to sacrifice his controlling interest in the Eagles at a price substantially below its true market value," 1 App. 30, and implemented in part by a "banking boycott" against appellants, id. 29; count two, a violation by FPB, Bunting, and Pemberton (collectively, FPB appellees) of the Bank Holding Company Act Amendments of 1970, 12 U.S.C. § 1972(3) (now § 1972(1)(C)); count three, malicious interference and conspiracy to interfere with appellants' advantageous contractual relations and business prospects, causing Tose to suffer severe emotional distress, in violation of Pennsylvania common law; and count four, a "conspiracy to fix interest rates in the four counties of Philadelphia, Bucks, Delaware and Montgomery," Pennsylvania, in violation of § 1 of the Sherman Act.[1] 1 App. 34. Appellants reached an amicable resolution of their disputes with Barness and Firestone before trial. Both limited partners sold their Eagles interests to Tose and the action against them was dismissed by stipulation.
 
 
 3
 On May 16 and 28, 1980, the district court ruled on cross motions for summary judgment, Tose v. First Pennsylvania Bank, 492 F.Supp. 246 (E.D.Pa.1980), denying appellants' motion for judgment on count four and entering judgment in favor of all appellees on that claim. It also entered judgment in favor of the FPB appellees on count two, the Bank Holding Company Act claim, and in favor of appellees Chase and Girard on all claims asserted against them.
 
 
 4
 Trial on the remaining claims commenced before a jury on June 2, 1980. Appellants presented evidence for fifteen days. At the conclusion of appellants' case in chief the remaining defendants moved for directed verdicts on all counts pursuant to Fed.R.Civ.P. 50. The trial court granted those motions on June 30.
 
 
 5
 Trial then commenced on a four-count counterclaim filed by appellee Forstater. (Forstater has filed a cross appeal in this court. To avoid confusion, we refer to Forstater as an appellee throughout this opinion, and to Tose, the Eagles, and Tose, Inc. as appellants.) The jury returned a verdict in favor of Forstater on one of the four counts, assessing damages of $69,000 against Tose and the Eagles, and in favor of appellants on all other counts. The district court entered a judgment in accordance with the verdict and subsequently denied Forstater's motions for judgment n.o.v. or a new trial.[2]
 
 
 6
 Appellants now argue that the district court erred in granting summary judgments and directed verdicts on the antitrust, Bank Holding Company Act, and pendent claims. Appellants also seek to overturn Forstater's $69,000 judgment, asserting that the court abused its discretion by excluding certain evidence and erred in its instructions to the jury. Forstater cross appeals from the denial of his motion for judgment n.o.v. or a new trial on another count of the counterclaim, arguing that he is entitled to judgment as a matter of law under the Pennsylvania Uniform Written Obligations Act, Pa.Stat.Ann. tit. 33, § 6 (Purdon 1967), and alternatively that there was insufficient evidence to sustain the jury's finding that Tose did not knowingly sign the writing in question.
 
 II.
 
 7
 We review grants of summary judgment and directed verdicts for legal error, testing the record by the same standards as the district court. On summary judgment, we inquire whether the court correctly concluded "that there (was) no genuine issue as to any material fact and that the moving party (was) entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On review of a directed verdict, we "consider the record as a whole and in the light most favorable to the non-moving party, drawing all reasonable inferences to support its contentions. If no reasonable resolution of the conflicting evidence and inferences therefrom could result in a judgment for the non-moving party," we must affirm. Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 115 (3d Cir. 1980), petition for cert. filed, 49 U.S.L.W. 3684 (U.S. Feb. 26, 1981) (No. 80-1458); see Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 25 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978). We recognize, of course, that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). On the other hand,
 
 
 8
 (w)hile we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.
 
 
 9
 First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).
 
 III.
 
 10
 Our narrative of the facts is based on the entire record, viewed in the light most favorable to appellants. Because the answers to the legal issues presented by this appeal depend on the factual predicate, it is necessary to set forth a lengthy narrative.
 
 A.
 
 11
 Tose purchased the Eagles football club in 1969, using $1.5 million of his own funds, $10.5 million borrowed from appellee FPB, and $4 million contributed by other investors, including Barness and Firestone. He acquired the Eagles' assets in his own name and then transferred them to a limited partnership of which he was general partner. In 1972 Tose borrowed another.$2.7 million from FPB to buy out some of his limited partners. The Eagles Partnership defaulted on an amortization payment of $750,000 due FPB in 1974, and the loan agreement was amended in 1975 to adjust the amortization schedule and to limit Tose to a $60,000 annual salary in unprofitable years. At the end of 1975 the Eagles Partnership consisted of Tose, the sole general partner, with approximately a 60% interest; Barness, 29%; Firestone, 5%; and another limited partner with about 6%. Tose and Barness agreed in June, 1976, to give each other the right of first refusal should either decide to sell his interest in the Eagles.
 
 
 12
 Relations among the partners became strained in 1976. Barness began openly criticizing Tose's management of the Eagles and demanded access to the club's financial records. Barness wrote to Tose in September, 1976, accusing him of "tak(ing) advantage of me and your other partners" and violating the loan agreement with FPB. He asked that Tose have accountants review the club's books for 1969 through 1976 and suggested that Tose make no withdrawals from the Eagles' account until the reviews were completed. 13 App. 3288-89. In a conversation with Firestone in October, 1976, Barness suggested "throwing Leonard out as general partner" as a "last option." 9 App. 2376, 2390. Barness' attorney wrote to one of Tose's attorneys on December 2, 1976, indicating that Barness had "agreed to give (Tose) a reasonable period of time to produce a purchaser for his interest provided that (Tose) agree to certain guidelines in operating the team" until a purchaser was found. Among the "guidelines," Barness demanded that appellee Forstater, who was then a part-time consultant to the Eagles,[3] be given control of all financial matters and be required to submit monthly reports to Barness. 2 App. 256-58.
 
 B.
 
 13
 Barness met with Gerald Hayes, an FPB loan officer, in late 1976 and again early in 1977. On both occasions Barness expressed dissatisfaction with the Eagles' financial management and threatened to go to court to seek appointment of a receiver. Hayes testified that he told Barness the bank was not "prepared to do anything" until it received pending financial statements. 11 App. 2767. Hayes called Forstater, his "contact" with the Eagles, to discuss his meetings with Barness; and Forstater echoed Barness' criticisms of Tose's management.
 
 
 14
 The Comptroller of the Currency reviewed FPB's loan portfolio at the end of 1976 and rated the Eagles loan "substandard." The Eagles' accountants notified the Eagles early in 1977 that they could not complete their financial statements for 1976 unless FPB waived several defaults under the loan agreement. In March, 1977, FPB received draft financial statements from the Eagles, which indicated a loss for the year of $1.15 million. On March 17, Hayes sent a memorandum regarding the Eagles to his superiors at FPB. Appellee Bunting, then Chairman of FPB, asked Hayes on March 21 to prepare a second draft of the memorandum to prepare him for a meeting with Tose. Hayes produced another draft dated March 24, 1977. That document is central to appellants' case.[4] It "recommended a meeting with Leonard Tose where the Bank would deliver a list of terms under which we would continue to provide financing to the Eagles." 2 App. 272. Hayes stated six reasons for this recommendation, including defaults on terms of the loan agreement, ineffective financial management of the Eagles, the 1976 losses, a projected failure to pay $500,000 due on May 31, 1977, and increasing obligations to players. He recommended that FPB require Tose to relinquish all financial control over the Eagles, give up the power to sign Eagles' checks, and retain a chief executive officer acceptable to the bank who would have complete decisionmaking power over the club's finances.[5] He anticipated that Tose would refuse the demands and seek to re-finance the loan at another bank, and he recommended that FPB allow him thirty days to find a new lender "and advise him that we are prepared to make demand on our loan agreement against the Eagles and against Tose personally." Id. 273. The memorandum concluded with a projected sequence of events that would follow implementation of the recommended "plan of action":
 
 
 15
 1. The meeting will be held with (Tose), and our demands will be presented to him.
 
 
 16
 2. He will take the alternative of replacement financing and we will give him thirty days to accomplish this.
 
 
 17
 3. Immediately after our meeting with Tose we should meet with Herb Barness and explain our plan, and try to get Barness to talk to Pete Rozelle to explain his position. Our counsel feels that this contact with Rozelle is critical, and will be very important if we have to force the sale of the Club. (Counsel) feels that Pete Rozelle might even put the pressure on Tose if he knew the seriousness of this situation because he doesn't want the Eagles Franchise looking like a World Football League franchise.
 
 
 18
 4. When Tose can't find financing the Bank should contact Rozelle and indicate that we are going to take action against Tose and the Club.
 
 
 19
 5. The rest will depend on Rozelle's reaction to the pressure from Barness and the Bank.
 
 
 20
 Id. 274.
 
 
 21
 Bunting and FPB initially took a gentler approach than Hayes had recommended. At a meeting on March 25, described by Tose at trial as "cordial," 10 App. 2585, Bunting proposed that Tose either agree to tighter financial controls or consider finding another lender; and Tose responded by indicating he would welcome tighter controls if FPB agreed to additional advances (projected at between $2 million and $5.5 million) to enable him to pay some other loans and to buy out Barness. The meeting ended with an agreement in principle to go forward on a plan for increased financing and tighter financial controls, including appointment of a controller to be recommended by the Eagles' accountants.
 
 
 22
 This agreement was never implemented. FPB made no more loans to Tose or the Eagles, and it regarded the financial controls that were installed as unsatisfactory. Negotiations between FPB and the Eagles continued through the spring and into the summer of 1977, growing increasingly acrimonious. Edwin Rome, Tose's attorney, met with Bunting and others on April 12 and learned that Bunting had discussed the agreement with Barness despite an express promise on March 25 not to do so.[6] Rome told Bunting that he was "shocked" because he "thought it a breach of a fiduciary duty on the part of Mr. Bunting to have talked with Mr. Barness not only contrary to his word to me, but contrary to his obligation owed to a customer of his bank." Id. 2476-77. Rome again met with Bunting and other bank officers on April 25, and he agreed to recommend that Tose retain Forstater as controller for a transitional period, until an outside controller could be chosen and could become familiar with the Eagles' operations. Rome indicated, however, that the Tose-Forstater relationship was "not what it had at one point been" and that "Mr. Tose would want to replace Mr. Forstater as soon as possible." Id. 2482.
 
 
 23
 Relations between the Eagles and FPB continued to deteriorate. Appellee Pemberton, then vice chairman of FPB, spoke with a lawyer in Rome's firm on June 7 and stated "that the Bank was withdrawing its commitment to advance funds in view of the total failure of cooperation from (Tose), the failure to conform to proposals made by the Bank for limitation of expenses, and the failure to sign the Forstater Employment Agreement." 2 App. 290. After some discussion Pemberton "quieted down and said that he would be willing to have a meeting although he wanted it understood that (Tose's lawyers) should advise (Tose) of the Bank's intentions." Id. 291.
 
 
 24
 Hayes met with Forstater on June 17. Hayes testified that he "was trying to develop a series of things that I could use in order to pressure Mr. Tose (into) getting the financial controls that we were trying to establish." 11 App. 2840. He acknowledged that he told Forstater that he was trying to develop a plan to "pressure" Tose, and he stated that Forstater "cooperated and answered all of my questions." Id. 2842.
 
 
 25
 On June 21, FPB's attorney sent Tose's attorneys a formal demand that Tose repay $20,000 to the Eagles and withdraw no additional funds for his personal account. (The loan agreement permitted Tose to draw $60,000 per year, and the letter alleged that he had taken $80,000 in the first six months of 1977.) The letter also advised Tose's attorneys that any checks drawn to cash or for Tose's account would not be honored unless countersigned by Forstater. On July 22, Pemberton wrote Tose to advise that FPB was no longer considering increasing the loans, stating as "principal reasons":
 
 
 26
 1. Failure to conclude negotiations with present limited partners of the Club.
 
 
 27
 2. The length of time that these negotiations have dragged on with no visible progress.
 
 
 28
 3. Failure to implement the cost reduction program which you had verbally agreed to carry out.
 
 
 29
 2 App. 299.
 
 
 30
 The Eagles-FPB controversy finally came to a head at a "showdown" meeting on July 28, 1977. Tose and Rome met at the bank with Bunting, who confronted them with an ultimatum. Bunting announced that he would "call" the Eagles loan as of nine o'clock the next morning[7] unless Tose agreed to step down from his management position and install Forstater as chief executive and financial officer of the Eagles. 10 App. 2483-85, 2595. Rome attempted to persuade Bunting to allow Tose a reasonable period to find other financing, as the parties had discussed on March 25, but Bunting refused, saying, "You have the money in" by nine o'clock or "we're taking over the Eagles." Id. 2596. Rome objected that the Eagles loan was not a demand loan but was due to be paid later that year. Bunting turned to Tose and said, "Well, you have Ed Rome here as your lawyer and he can take us into court, I know, and you might win. But that's going to take a long time. And in the meantime we are going to kill you." Id. 2486. Tose "tried to say several things" but was interrupted by Bunting, who stated, "I'll make sure that you don't get any financing from any bank in the City of Philadelphia I'll even go better than that. I'll make sure you don't get financed by any bank in the country." Id. 2594-95.
 
 
 31
 Immediately after the showdown meeting Tose instructed Rome to agree to the bank's demands. A meeting was held at the Eagles' Veterans Stadium offices the next afternoon, July 29. Pemberton read from a document describing Forstater's duties as chief executive and financial officer of the Eagles. Pemberton also assured Eagles representatives that the bank would not interfere with the Eagles' football program.
 
 C.
 
 32
 Tose quickly began negotiations aimed at securing replacement financing. On August 8 he agreed to terms for a short-term (six months) loan from a Detroit bank, which bought out the FPB loan. Tose immediately discharged Forstater and resumed control of the Eagles' operations. At a press conference on August 10 he criticized Bunting, Forstater, and others for participating in the brief takeover. He spent much of the ensuing months attempting to arrange long-term financing. During that period he negotiated with appellees Provident, Girard, Chase, and Philadelphia National, but none agreed to grant a loan. On March 1, 1978, Tose and the Eagles closed long-term loans with Citibank of New York. Appellants sought to prove at trial that each of the appellee banks joined with FPB in a banking boycott, designed to deny Tose and the Eagles access to the credit market, between July 29, 1977, and March 1, 1978.D.
 
 
 33
 In early August, before the Detroit bank agreed to a short-term loan, a Citibank officer contacted Hayes of FPB with a credit inquiry. Hayes reported, inter alia, that "(d)ifficulties (had) arisen among the (Eagles) partners, basically concerning Tose's lack of cost consciousness," and that "(u)p until two years ago the franchise was operating quite profitably but due to increased salary costs and the lack of controls over costs, the club has slipped into the red." 2 App. 309. Pemberton later called the same bank officer "to make sure that (he was) aware of certain facts and details in addition to those discussed with Hayes." Id. The officer did not discuss the matter with Pemberton because Citibank already had decided not to meet with Tose and considered the question closed. Another Citibank officer telephoned Bunting with a credit inquiry in December and was told, "we couldn't control Tose and he has debts all over the country. He is a high spender a big liver I wouldn't go near him with a 170 (foot) pole. He has a horrible credit background. I suggest you exercise caution in any dealings with him." Id. 312.
 
 E.
 
 34
 Appellee Philadelphia National Bank (PNB) was asked to participate in a syndicated loan to Tose and the Eagles on several occasions between July 29 and March 1. The first inquiry came from a Belgian bank in early August. The Belgian bank contacted PNB through its London subsidiary, requested background information on Tose and the Eagles, and asked PNB to participate in a joint loan. An officer of the London subsidiary passed the request along to PNB Senior Vice President Anthony Newton. Newton discussed the proposal with two other PNB vice presidents who had responsibility for loans. All three "felt very negative about the proposal" because the FPB-Eagles situation had "received a great deal of very negative publicity very recently." Id. at 392. Newton reported to his London associate, who in turn advised the Belgian bank, that PNB was definitely not interested in participating in the loan and that the Belgian bank should "walk very carefully" if it participated. 4 App. 801-02. Newton explained that PNB was not interested in an Eagles loan because Tose "had a reputation as a dissipated playboy," because of publicity regarding the FPB loan, because "there was a suggestion that (FPB) might have to step in to manage the Eagles," and because "the feeling was that the Eagles were in financial difficulty and possibly Leonard Tose as well." Id. 801.
 
 
 35
 In December, 1977, or January, 1978, Charles Sullivan, an attorney who represented the National Football League, telephoned PNB Chairman Morris Dorrance to ask whether PNB would consider participating in a loan to the Eagles. Sullivan pointed out that additional television revenues, which could be assigned as collateral for a loan, would soon be made available to the Club by the NFL. Dorrance considered the inquiry but called Sullivan thereafter to decline. Dorrance testified at trial that he made a policy decision not to finance Tose or the Eagles without "look(ing) at (the proposal) to determine if it was sound." Id. 1048. He testified that he objected to the loans because of PNB's philosophy, that a banking institution "ought not to be the focus of controversy in the public light." Id. 1052. He also commented that "Mr. Tose was making some strong accusations about who had done what to whom. And that's not the kind of customer relationship that I am interested in." Id. 1036. Dorrance did concede in his conversations with Sullivan that the NFL's promise to provide additional revenues from television was "a very solid commitment and, therefore, financible." Id. 1049. Dorrance and Newton both testified that they decided to reject the inquiries independently, without communicating with officials of other banks and without specific knowledge of the Eagles' and Tose's applications at any other bank.
 
 F.
 
 36
 In November, 1977, Pittsburgh Steelers President Dan Rooney and his attorney contacted Harold Kline, Executive Vice President of appellee Provident, to seek financing for Tose and the Eagles. Kline promised to consider the application on its merits. He met with Tose on December 9 and with Sullivan on December 14, 1977, to discuss the application.[8] Sullivan gave Kline a memorandum summarizing the loan proposal, which indicated that the NFL would agree to pay $1.5 million per year in television revenues directly to the bank, and that it would agree to "assume responsibility for selling the Club" to "a purchaser who agrees to satisfy any outstanding partnership and personal indebtedness" in the event of a default. 2 App. 436. Negotiations between the Eagles and Provident continued through December and into January. Kline prepared a draft commitment letter setting out terms of a projected agreement on January 19 and submitted it to the bank's counsel later that month. The Eagles opened a "lock box" account at Provident. Top bank officers regarded the loan as "doable" (do-able). 4 App. 930, 943.
 
 
 37
 On December 27, 1977, Louis Goffman, a Philadelphia lawyer and a Provident director, advised Provident Chairman Roger Hillas that his law firm represented Barness in team-related litigation against Tose. Goffman had previously learned through his board membership that the bank was negotiating with Tose and the Eagles. After talking to Hillas, Goffman arranged a meeting between Hillas and Barness on December 29. Hillas testified that Barness exhibited no hostility toward Tose, notwithstanding the litigation. Both testified that Barness encouraged Provident to lend money to the team but was concerned about the possible impact on his interests of a personal loan to Tose secured by the team. Both testified also that the bank did not agree to condition the loans on Barness' approval, and Barness stated that he did not request any commitments from the bank. Tose met with Kline and others on January 26, 1978, to review Tose's personal finances. Kline testified that he stated at the meeting that "all paperwork would have to pass muster" with the bank's attorneys because the bank wanted to avoid litigation, and that the bank might require an amended Eagles partnership agreement to provide Tose with income to meet his personal obligations. 12 App. 3232-33. Tose testified as follows:
 
 
 38
 Mr. Kline said to me, after we sat down I think he said, "Everything looks pretty good. You know, it looks all right. But there is something I shouldn't tell you, but I am going to tell you."
 
 
 39
 I didn't know what to expect. He said, "I want you to know that Mr. Barness had a meeting with our chairman."
 
 
 40
 I said to myself, and I looked at the other people that were with me, friends and associates, and I said to myself, "Let's get the hell out of here," because he said Barness would have to approve the loan.
 
 
 41
 10 App. 2622-23. Kline and Sullivan continued to discuss the loan proposal for a brief period, but there were no negotiations after February 2. Hillas and Kline both testified that they did not discuss the proposal with employees of any other bank.
 
 G.
 
 42
 Appellee Chase was first asked to participate in a loan to Tose and the Eagles by officials of the Lincoln Bank of Bala Cynwyd, Pennsylvania, in November, 1977. Officials of the two banks met with Tose and other Eagles representatives on December 8 to discuss the loan proposals.[9] Chase asked its counsel the same day to review the proposals. On December 9 Chase telephoned FPB with a credit inquiry and was told, "Our bank no longer deals with Mr. Tose. Published information will offer the reasons for our discontinuing our relationship. I can offer no details regarding his affairs." 2 App. 482. Negotiations continued between Chase and the Eagles, but the bank's counsel identified numerous obstacles to the loan.[10] Tose telephoned attorney Rome's office on December 20, 1977, and stated that he did not want to continue the discussions with Lincoln and Chase "in view of the new conditions imposed by the banks." Id. 498. Rome, apparently unaware of Tose's call, met with Chase officials and attorneys in New York the same day and attempted to alleviate their concerns. After listening to presentations by Rome and a Lincoln officer the Chase representatives announced that Chase was not prepared to go forward with the loans, but that they would reconsider if problems could be worked out.[11] A Chase vice president wrote to Tose on December 27 declining the loan because of "unresolved legal matters and the expectation that a significant additional commitment of our time will be required with no assurance of a favorable outcome." Id. 499.
 
 H.
 
 43
 In September, 1977, a loan officer at appellee Girard was contacted by James Duffy, an accountant employed by the Eagles, to ask whether Girard was interested in financing the Eagles. The loan officer discussed the inquiry with Girard vice president Walton St. Clair, who instructed him to tell Duffy that Girard was not interested. St. Clair testified at deposition that he based his decision on "(t)he general reputation of Leonard Tose." 3 App. 694. He explained that Tose was reputed to be "a very difficult man to deal with" and that a bank that dealt with Tose was likely "to be in the newspapers all the time with the various problems that he might or might not get involved in, and we didn't need that kind of aggravation." Id. 701.
 
 
 44
 In October, 1977, the president of a St. Louis bank called Girard president William Eagleson to ask whether Girard would participate in a loan to the Eagles. Eagleson referred the inquiry to St. Clair and instructed him to discuss the matter with a loan officer at the St. Louis bank. St. Clair told the loan officer that Girard had previously declined to discuss a loan to the Eagles because of Tose's reputation, and that it would consider the St. Louis inquiry because it came from a correspondent bank, but that "we really weren't very interested in the transaction." Id. 693. He agreed to await a report from the St. Louis officer concerning discussions with Tose or his representative. He subsequently reconsidered, however, and after discussions with Eagleson he notified the St. Louis bank that Girard was not interested.
 
 
 45
 Duffy again contacted Girard in late January to ask whether Girard would participate in a loan with a New York bank. St. Clair met with Duffy and others on February 2, 1978.[12] After hearing Duffy's presentation St. Clair agreed to meet with officials of the New York bank the following Monday, February 6. He also asked to meet with Tose and stated that if "he was able to convince us that he was a reasonable individual we would probably make the loan." St. Clair deposition at 38. Again, however, St. Clair reconsidered his position, this time after discussing the Duffy proposal with other Girard officers,[13] and at the scheduled Monday meeting he told the New York bankers that Girard would not participate.
 
 
 46
 The foregoing representing what we perceive to have been appellants' best case scenario, we now turn to familiar legal precepts which govern the law of trade restraints.
 
 IV.
 
 47
 Section 1 of the Sherman Act outlaws "(e)very contract, combination , or conspiracy, in restraint of trade " Section 4 of the Clayton Act, 15 U.S.C. § 15, provides a treble damage remedy, plus "the cost of suit, including a reasonable attorney's fee," to "(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." The question of injury is not before us.[14] We consider only whether the district court erred in determining that appellants failed to establish a prima facie case of a § 1 violation by proving the elements of conspiracy and restraint of trade.
 
 
 48
 It is well established, of course, that the Sherman Act may not be read literally. "(R)estraint is the very essence of every contract; read literally, § 1 would outlaw the entire body of private contract law." National Society of Professional Engineers v. United States, 435 U.S. 679, 687-88, 98 S.Ct. 1355, 1363-1364, 55 L.Ed.2d 637 (1978) (footnote omitted); see Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). To decide whether the defendants' conduct violates the restraint of trade element of § 1 we must determine whether to apply a per se rule or a rule of reason, and if we choose the latter our inquiry must focus on the conduct's "impact on competitive conditions." Professional Engineers, 435 U.S. at 688, 690, 98 S.Ct. at 1363-1364; see generally id. at 687-92, 98 S.Ct. at 1363-1365.
 
 A.
 
 49
 Appellants urge that "an agreement between Barness, Forstater, Bunting and the First Pennsylvania Bank to force a distress sale in favor of Barness is illegal per se." Brief for Appellants at 26 (citing Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979)). Cernuto, however, does not support appellants' theory. There we overturned a summary judgment for defendants and remanded for trial on grounds the evidence might make out a per se violation, but we did so purely on the theory that the evidence might demonstrate a conspiracy to fix prices by eliminating a price competitor from the market. We perceive no allegation or evidence of price fixing here.[15] Moreover, as Cernuto noted, per se treatment has been limited to "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Id. at 166 (quoting Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). As the Court has noted more recently, "(i)t is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." United States v. Topco Associates, 405 U.S. 596, 607-08, 92 S.Ct. 1126, 1133-1134, 31 L.Ed.2d 515 (1972) (quoted in Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979)). The law of antitrust is a collection of judicially formulated legal precepts giving fiber and sinew to the abstract language of the statutes. The courts that have formulated these precepts have accompanied them by a reasoned elaboration. In carving out per se categories, the courts have not abandoned the necessity for a rule of reason. Rather, the per se doctrine is the law's recognition that probabilities abide in the laws of business and logic. Where judicial experience teaches that a particular business practice "blatantly restricts competition," to use Professor Sullivan's phraseology, it is not necessary to set forth an expansive explanation. We are "spared the need for elaboration," because the laws of economics persuasively predict how the balance will come out. See L. Sullivan, Handbook of the Law of Antitrust § 72 (1977). As to this case, however, we are not aware of any body of judicial experience teaching that "an agreement to force a distress sale" of a partner's share of a business has a "pernicious effect on competition and lack(s) any redeeming virtue," so we find no warrant for application of a per se rule.
 
 B.
 Under the rule of reason we consider
 
 50
 whether the challenged contracts or acts "were unreasonably restrictive of competitive conditions." Unreasonableness under that test could be based either (1) on the nature or character of the (conduct) or (2) on surrounding circumstances giving rise to the inference or presumption that (it was) intended to restrain trade and enhance prices. Under either branch of the test, the inquiry is confined to a consideration of impact on competitive conditions.
 
 
 51
 Professional Engineers, 435 U.S. at 690, 98 S.Ct. at 1364 (footnotes omitted) (quoting Standard Oil Co. v. United States, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911)). Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (to recover treble damages on account of Clayton Act § 7 violations, plaintiffs "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation").
 
 
 52
 Appellants contend that appellees FPB and Forstater conspired with Barness to force Tose to sell his partnership interest in the Eagles. We think appellants' claim against these appellees must fail because they have neither alleged nor proved an unreasonable restraint of trade. Appellants offered no evidence that the purported conspiracy would or was intended to damage competition in any market, choosing to rise or fall on their per se theory. We are unable to discern how appellees' conduct would affect competition, either favorably or harmfully, and we find no evidence of any anticompetitive motive. Clearly the conduct of FPB, Barness, and Forstater make out a strong case that they, individually and collectively, for separate reasons, resisted Tose's efforts to obtain financing on the terms he proposed. And just as clearly the record indicates that officers of FPB are not averse to playing hard ball when the corporate mind is made up to rid themselves of one of their customer debtors. But proof of ruthlessness in the FPB executive suite is not proof of a violation of the federal antitrust statutes. The antitrust laws are simply indifferent to conduct of this nature. No appellee competes with any appellant in any market or line of commerce; and there is no evidence that the professional football team's ability to compete in the spectator sport or entertainment industry in the Philadelphia area, or in any other market, would be either assisted or thwarted by a change of ownership. Tose alleges that he has suffered actual damage as a result of appellees' attempt to force him to sell the Eagles, and for present purposes we must assume the truth of that allegation. See footnote 14, supra. We see nothing, however, to demonstrate that Tose has been damaged as a competitor or as a result of any anticompetitive practice. We cannot hold on this record that those who engage in a struggle for partnership control of one entity are competitors for purposes of the Sherman Act. Cf. United States v. Morgan, 118 F.Supp. 621, 689 (S.D.N.Y.1953) ("(w)hen we speak of competitors nothing but confusion will follow unless we first determine what is the 'it' for which the competitors are supposed to be competing"). Nor are we inclined to open the door to antitrust claims against, for example, a bank that agrees to finance a minority stockholder's tender offer. Sales of businesses are a fact of life in our economy, carefully regulated by Congress in another part of Title 15, and we suspect that many are encouraged by the efforts of uneasy and perhaps overbearing creditors to protect their investments and of minority owners to oust established management. Without proof of anticompetitive intent or impact, losses sustained in an intracorporate or intrapartnership power struggle "are of no concern to the antitrust laws."[16] Brunswick, 429 U.S. at 487, 97 S.Ct. at 697. See generally In re Transocean Tender Offer Securities Litigation, 427 F.Supp. 1208 (N.D.Ill.1977). We find nothing in either the nature or character of the alleged conduct or its surrounding circumstances to support an inference that it was intended or likely to restrain trade or enhance prices. Accordingly, we hold that appellants did not establish a prima facie case under § 1 of a conspiracy consisting of FPB, Barness, and Forstater.[17]
 
 V.
 
 53
 We see no similar obstacles to appellants' claim that the appellee banks and others conspired to deny them access to the credit market. The clear effect of such a conspiracy would be to stifle competition among the participants for a substantial credit transaction, with the further result of hindering the free flow of goods, services, and investment capital as dictated by market forces of supply and demand. We conclude that appellants have successfully alleged an unreasonable restraint of trade in violation of § 1. Therefore, we must review the record to determine whether appellants were entitled to a jury determination of the question of a banking boycott conspiracy involving, variously, Barness, and the First Pennsylvania, Provident, Girard, Chase, and Philadelphia National banks. The banking boycott allegations relate to the period from July 29, 1977, to March 1, 1978. Appellants attempted to prove that Barness and FPB persuaded Provident, Girard, Chase, and PNB to join a conspiracy to deny Tose and the Eagles access to the credit market and thereby to force Tose to sell his interest to Barness.
 
 A.
 
 54
 We begin by determining that FPB was not shown to be a participant in any conspiracy to interfere with the credit market. There is no evidence that any FPB personnel discussed Tose or the Eagles with Barness after July 28, and the only evidence of any contact between FPB and any other appellee bank shows that FPB responded to a telephoned credit inquiry from Chase by stating that FPB "no longer deals with Mr. Tose," referring the caller to "(p)ublished information," and declining to provide any "details regarding his affairs." 2 App. 482. Appellants properly emphasize Bunting's July 28 threat to "make sure you don't get financed by any bank in the country." 10 App. 2595. We recognize that this language is highly inculpatory, a direct threat to deny appellants the financing they desperately needed to stay afloat. This evidence, together with evidence of Hayes', Pemberton's, and Bunting's responses to credit inquiries, would support a finding that FPB desired and attempted to discourage other banks from granting loans to Tose or the Eagles. Section 1 does not prohibit unilateral activity, however. As one cannot clap with one hand, and as it takes two to tango, so in a § 1 case there must be proof of more than solitary conduct; there must be proof of concerted action. See, e. g., United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); Sweeney, 637 F.2d at 110-11. We have searched the record in vain for evidence from which a jury could reasonably infer that FPB and others had "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).
 
 
 55
 Other courts of appeals have previously determined that § 1 does not reach a putative "conspiracy" between a corporation and its employees.[18] This simply is not regarded as the requisite "concerted action." The leading decision Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). Judge Borah wrote for the court in Nelson Radio, FN18. See, e. g., Card v. National Life Insurance Co., 603 F.2d 828, 834 (10th Cir. 1979); H & B Equipment Co., Inc. v. International Harvester Co., 577 F.2d 239, 244 (5th Cir. 1978); Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910, 917 (8th Cir. 1976); Greenville Publishing Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 399-400 (4th Cir. 1974); Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635, 643 & n.9 (9th Cir. 1969).
 
 
 56
 Surely discussions among those engaged in the management, direction and control of a corporation concerning the price at which the corporation will sell its goods, the quantity it will produce, the type of customers or market to be served, or the quality of goods to be produced do not result in the corporation being engaged in a conspiracy in unlawful restraint of trade under the Sherman Act The defendant is a corporate person and as such it can act only through its officers and representatives. It has the right as a single manufacturer to select its customers and to refuse to sell its goods to anyone for any or no reason whatsoever. It does not violate the Act when it exercises its rights through its officers and agents, which is the only medium through which it can possibly act.
 
 
 57
 200 F.2d at 914. The Nelson Radio rule arguably has not heretofore been established in this circuit. Compare Johnston v. Baker, 445 F.2d 424, 427 (3d Cir. 1971), with Goldlawr, Inc. v. Shubert, 276 F.2d 614, 617 (3d Cir. 1960). We now adopt the reasoning of Nelson Radio and hold that a corporation and its employees cannot be treated as separate entities to establish a conspiracy under § 1. This precludes any suggestion that FPB conspired with its officers, appellees Bunting and Pemberton, or that Bunting and Pemberton conspired between themselves or with other FPB employees.
 
 B.
 
 58
 We turn now to the other appellee banks. We note preliminarily that witnesses representing each of the banks testified that they made their decisions independently, without discussing appellants' applications with officials of any other banking institution. Appellants are not bound by that testimony, of course, and a jury would be free to disregard all such evidence; but "mere disbelief could not rise to the level of positive proof of agreement to sustain (appellants') burden of proving conspiracy." Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309, 1313 (3d Cir. 1975); see Moore v. Chesapeake & Ohio Railway Co., 340 U.S. 573, 576-78, 71 S.Ct. 428, 429-430, 95 L.Ed. 547 (1951).
 
 1.
 
 59
 With regard to both phases of the alleged conspiracy, appellants make much of the point that appellees and others had opportunities to conspire. See, e. g., Brief for Appellants at 27, 29. We agree that there was ample proof of opportunity to conspire. For example, the record would support a finding that each alleged conspirator had access to a telephone at all relevant times, and a jury could find that members of the Philadelphia banking community belong to an "old boy network" and have numerous social and business relationships. But we must recognize the distinction between opportunity to perform an act and its actual performance. Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place. Inferred factual conclusions based on circumstantial evidence are permitted only, and to the extent that, human experience indicates a probability that certain consequences can and do follow from basic facts. Human experience does not support the inference of actual conspiracy from proof of the basic fact of opportunity to conspire.
 
 2.
 
 60
 Appellants offered no direct evidence of conspiracy, but they argue that concerted action may be inferred from evidence of parallel business behavior. In such a case a plaintiff must establish "two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior: (1) a showing of acts by defendants in contradiction of their own economic interests, and (2) satisfactory demonstration of a motivation to enter an agreement " Venzie, 521 F.2d at 1314 (citations omitted). Appellants attempted but failed to prove each of these elements. To meet the first element, appellants argue that "there is evidence in the present case that the loan was a profitable business deal for the banks and that there were substantial fringe benefits in promoting the loan." Brief for Appellants at 30 (footnote omitted). As to the second, they contend that the banks had "strong motives to support Bunting, inter alia, against the 'insolent' behavior of Tose in challenging Bunting publicly in the press conference of August 10, 1977." Id. at 31.
 
 
 61
 We assume, without deciding, that appellants introduced sufficient evidence to support a finding that the loan applications were "a sound business proposition with substantial profit potential." Id. at 11. Such a finding would not alone support the further inference that the banks acted in contradiction of their own economic interests. Each appellee bank presented substantial business reasons for its actions, and appellants did not challenge or rebut those explanations. We must consider the record as a whole and we cannot permit a jury to rest its decision on speculation or unreasonable inferences. A business's refusal to enter a transaction, even a transaction with potential for a substantial profit, cannot support an inference that it acted in contradiction of its own economic interests in the face of substantial unrebutted and unimpeached evidence that its refusal was consistent with its own best interests. See, e. g., Venzie, 521 F.2d at 1314-15.
 
 
 62
 Even if we were to resolve the first element of the Venzie test in appellants' favor, however, we would hold that they have failed to satisfy the second element, proof of motivation to enter an agreement. Appellants rely on the banks' "many relationships among themselves," which include "participating loans , close ties in the Philadelphia Clearing House , corresponding relationships(,) and personal friendships of long standing." Brief for Appellants at 31. This presentation must be weighed against the business justifications offered by appellees, and against the inherent improbability of an agreement to refuse profitable business for non-economic reasons. Appellants' evidence of motivation is clearly insufficient. The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncracies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts. As the Supreme Court has stated, "the essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943). We are persuaded that the district court properly refused to permit the jury to render a verdict in this case based on "mere speculation."
 
 3.
 
 63
 We review the evidence relating to appellee Provident separately because it was clearly established that Provident officers discussed Tose and the Eagles with Barness while it was considering the loan applications.[19] We assume, again without deciding, that the jury could find that Barness hoped to block any loan to Tose so that Tose would be forced to sell. There is no evidence, however, that he enlisted or attempted to enlist Provident as an ally in that purpose. Moreover, appellants have not explained why Provident would forego a profitable opportunity in order to help Barness take over the Eagles. Absent either direct evidence of a specific conspiracy or circumstantial evidence that would vault parallel business behavior into "concerted action" under the Venzie test, the most damaging reasonable inference is that Barness persuaded Provident to condition its loan on his approval by demonstrating his ability to prevent execution on the collateral. This falls far short of "a conscious commitment to a common scheme designed to achieve an unlawful objective." Sweeney, 637 F.2d at 111.
 
 4.
 
 64
 We conclude, therefore, that a jury could not reasonably infer from the evidence that any appellee conspired with any other person or entity to deny Tose access to the credit market, and that the district court did not err in granting summary judgments and directed verdicts on count one.
 
 VI.
 
 65
 Count four of the amended complaint charges the appellee banks with conspiring to fix interest rates in the greater Philadelphia four-county area. Appellants' theory is that express written agreements among banks to follow the prime interest rate charged by the lead bank on joint loans have the effect of "tampering" with the prime interest rate charged on single bank loans, and therefore that they are per se violations of § 1. They do not assert that the evidence shows any express agreements to fix the interest rates on single bank loans. See Brief for Appellants at 39. We think the merits of this claim are doubtful,[20] but we do not consider the merits because appellants lack standing to assert this claim.
 
 
 66
 To satisfy "the minimum (standing) requirement of Art. III" a plaintiff must "establish that, in fact, the asserted injury was the consequence of the defendants' actions ...." Warth v. Seldin, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975). See generally O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Linda R.S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). See also Van Dyk Research Corp. v. Xerox Corp., 631 F.2d 251 (3d Cir. 1980), petition for cert. filed, 49 U.S.L.W. 3620 (U.S. Feb. 11, 1981) (No. 80-1353); Sound Ship Building Corp. v. Bethlehem Steel Co., 533 F.2d 96 (3d Cir.), cert. denied, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). Appellants have failed to establish the necessary personal stake in the controversy, the requisite injury in fact. Tose and the Eagles had only a single-bank loan, so they were not directly affected by the practice of lock-step pricing of joint loans. Their argument rests on the assertion that "it ought to be obvious that a multitude of agreements on joint loans by which banks reciprocally agree to charge each others' prime interest rate has a natural tendency to stabilize the prime interest rate generally and, indeed, to make it identical among all banks." Brief for Appellants at 41. They attempt to bolster this assertion by pointing to "the striking identity of defendants' prime interest rate changes over the years." Id. at 40. This is insufficient. Bald factual assertions will not substitute for evidence of causation, and "the striking identity of defendants' prime interest rate changes" can be readily explained by market pressures.[21] Appellants produced no evidence that lock-step pricing of joint loans had any effect on the rate charged on their own loans, and by their cross-motion for summary judgment they implicitly represented that they had no additional evidence to offer. We hold, therefore, that the district court did not err in granting summary judgment on count four of the amended complaint.
 
 VII.
 
 67
 We now turn to count two, the Bank Holding Company Act claim. Appellants argue that the FPB Appellees violated 12 U.S.C. § 1972(1)(C), which provides: "A bank shall not in any manner extend credit on the condition or requirement (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan " Section 1975 authorizes private actions for treble damages for violations of § 1972. Appellants find violations in
 
 
 68
 (1) the conspiracy to oust Tose in favor of Barness as a condition for financing the Eagles; (2) the insistence that a known disloyal subordinate (Forstater) be installed as chief executive officer over Mr. Tose as a condition either for continuing the $5.3 Million term loan to its stated maturity date in 1979 or for re-lending the Eagles their own pre-season (ticket) money ; and (3) the plan to force Tose to sell to Barness....
 
 
 69
 Brief for Appellants at 32.
 
 
 70
 Items (1) and (3) are essentially identical and may be considered together.[22] There is no evidence that Tose's ouster in favor of Barness was made a "condition or requirement" of a loan to the Eagles or to Tose. Appellants allege only that Tose's ouster in favor of Barness was the hidden agenda behind the conspiracy charged in count one. This does not satisfy the "condition or requirement" element of § 1972(1)(C). Summary judgment was properly entered on this theory.
 
 
 71
 Summary judgment also was proper on item (2) of this claim, but for a different reason. Appellees concede that FPB demanded that Tose relinquish financial control of the Eagles to Forstater as a condition to continuing the loan. In the circumstances of this case, however, we hold as a matter of law that this was not a demand for a "service other than those related to and usually provided in connection with a loan." Imposition of financial controls over the Eagles was directly related to maintaining the security of FPB's substantial investment, and the bank's demand cannot be considered unusual in the face of substantial evidence that it had good reasons to be concerned about the loan. As the district court held in Sterling Coal Co., Inc. v. United American Bank in Knoxville, 470 F.Supp. 964, 965 (E.D.Tenn.1979), "(t) he Act does not prohibit attempts by banks to protect their investments." Our holding agrees with the first circuit's recent decision in B.C. Recreational Industries v. First National Bank of Boston, 639 F.2d 828 (1st Cir. 1981). The court held in that case that a creditor's demand that its debtor employ a designated full-time business advisor, because it felt that the debtor was "in a precarious financial condition," id. at 829, Trade Cases at page 78,139, was "within the range of appropriate traditional banking practices permissible under the Act." Id. at page 832. Our approach also finds support in the legislative history of the Act, which states that § 1972(1)'s purpose "is to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." S.Rep.No.1084, 91st Cong., 2d Sess. 17, reprinted in (1970) U.S.Code Cong. & Ad.News 5519, 5535. This purpose would not be served in any way by holding FPB's conduct illegal. We find nothing anticompetitive in a requirement that a debtor put its financial house in order by replacing its chief financial officer with a responsible official designated by the bank.[23]
 
 VIII.
 
 72
 Invoking the pendent jurisdiction of the district court, Tose asserts claims for intentional interference with "present contractual relations" and "prospective advantageous business relations." These claims are recognized as compensable torts under the law of Pennsylvania. See Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 207-10, 412 A.2d 466, 470-72 (1979); Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 416, 429-33, 393 A.2d 1175, 1181-84 (1978), appeal dismissed, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979); see also Restatement (Second) of Torts §§ 766, 766B (1977). Tose, however, claims only damages for the emotional distress which appellees reasonably could have expected to result from their actions. This injury alone is not compensable in an action for interference with contractual or business relations. Restatement (Second) of Torts § 774A(1)(a)-(c), respectively, permit recovery of damages for the pecuniary loss of the benefits of the contract or the prospective relation, consequential losses legally caused by the interference, and emotional distress or actual harm to reputation reasonably expected to result from the interference.[24] Section 47 of the Restatement (Second), however, provides, with exceptions not relevant to this case, that tortious conduct "does not make the actor liable for an emotional distress which is the only legal consequence of his conduct." Reading the two sections together, Tose can recover for emotional distress under § 774A(1)(c) only if he also proves damages under subsection (a) or (b), or actual harm to reputation under sub-section (c). He only claims damages for emotional distress.
 
 
 73
 Even if we did not affirm on this basis, however, we would hold that Tose failed to establish a prima facie case of liability. His ownership interest in the Eagles is not a present contractual relationship protected by Pennsylvania common law, and if it were he has not established any interference with that relationship. His claim for interference with prospective business relationships with the appellee banks also fails for two reasons: first, he did not introduce "adequate proof" of a "reasonable likelihood or probability" that he would receive loans from any bank absent the alleged interference. See Thompson Coal, 488 Pa. at 209, 412 A.2d at 471. Second, he did not introduce sufficient evidence to support a finding that any appellee improperly interfered with his prospective business relations. See Part IV.B., supra ; Restatement (Second) of Torts §§ 767, 772.
 
 IX.
 A.
 
 74
 Forstater recovered $69,000 on a counterclaim based on an oral contract of employment between himself and appellants. The district court asked the jury to determine whether Forstater was "a disloyal employee who agreed with First Pennsylvania Bank to attempt to force Mr. Tose to sell his share of the Eagles," Joint App. at 370, presumably on the theory that Forstater's disloyalty would constitute a breach of the contract and justify his discharge. The jury answered this interrogatory in Forstater's favor. Id.
 
 
 75
 Appellants raise two objections on appeal. First, they argue that the district court abused its discretion in directing the jury to disregard certain evidence presented at the trial on appellants' claims. Brief for Appellants at 34. This argument misrepresents the record. The district court did not direct the jury to disregard any evidence, but began its charge by specifically instructing the jury to consider evidence "offered in the original case brought by Mr. Tose." Joint App. at 311; see also id. at 315-16. Appellants cite 10 App. 2732-33, but those pages contain a transcript of the argument on which exhibits should go to the jury room, not jury instructions. Appellants do not argue that the court abused its discretion in selecting exhibits for the jury room, and we see no reason to hold that it did so. We conclude, therefore, that appellants' argument that "the jury was improperly precluded from considering competent evidence," Brief for Appellants at 35, is without merit.
 
 
 76
 Second, appellants contend that the trial court erred in instructing the jury that if Forstater told the truth he could not be "disloyal," without discussing the scope of his authority or whether he would have injured his employer if he exceeded his authority. Brief for Appellants at 35-36. Again, however, appellants mischaracterize the record. The court actually told the jury that "if Mr. Forstater was obliged, as a part of his duties for the Eagles and Mr. Tose," to answer FPB's questions on behalf of Tose and the Eagles, "the answering of the questions truthfully could not lead to an inference of disloyalty." Joint App. at 351 (emphasis added). The court continued its charge by telling the jury to base its "disloyalty" decision on its "evaluation of all the evidence," id., and then discussed evidence favorable to appellants. Id. at 352-53. We see no error in the instruction. In addition, the record fails to demonstrate that appellants objected to these instructions before the jury retired to consider its verdict, as required by Fed.R.Civ.P. 51, so they are precluded from raising the issue on appeal.
 
 B.
 
 77
 Forstater's cross appeal assigns error to the district court's refusal to grant judgment n.o.v. or a new trial on a counterclaim based on a written promise by Tose to pay him $159,000. His appeal depends on a letter to Forstater signed by Tose and on § 1 of the Pennsylvania Uniform Written Obligations Act, Pa.Stat.Ann. tit. 33, § 6 (Purdon 1967). That statute provides: "A written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound." The letter on which Forstater relies is worded as a proposal, but the parties have construed it as a promise to pay the money. The letter concludes as follows:
 
 Intending to be legally bound, I am
 
 78
 Sincerely,
 
 
 79
 /s/ Leonard H. Tose
 
 Leonard H. Tose
 
 80
 Joint App. at 39.
 
 
 81
 Forstater argues on appeal that the district court erred in permitting the jury to consider whether Tose signed the letter "knowingly," and he argues alternatively that there was insufficient evidence to sustain the jury's finding that Tose did not sign knowingly.
 
 
 82
 Forstater would have us hold that under Pennsylvania law a promise containing language of intention to be legally bound is enforceable as a matter of law, without regard to any defenses available to the promisor, and therefore that the district court erred in denying his motion for judgment n.o.v. We cannot agree. The statute provides only that a promise in proper form "shall not be invalid or unenforceable for lack of consideration." It does not purport to do away with any other defense to enforceability, and we construe it according to its terms. Our position is supported by Rose v. Rose, 385 Pa. 427, 123 A.2d 693 (1956), in which the Pennsylvania Supreme Court held void a promise executed in compliance with the Written Obligations Act that was induced by "bad faith or fraud." Id. at 433, 123 A.2d at 697.
 
 
 83
 We agree that the district court's instruction, that a lack of knowledge would relieve Tose of liability, was erroneous. Ignorance of the contents of a document or failure to read before signing is no defense to a contractual obligation under Pennsylvania law. See, e. g., Estate of Brant, 463 Pa. 230, 235-36, 344 A.2d 806, 809 (1975); T. W. Phillips Gas & Oil Co. v. Kline, 368 Pa. 516, 518, 84 A.2d 301, 302 (1951). See also Brokers Title Co., Inc. v. St. Paul Fire & Marine Insurance Co., 610 F.2d 1174, 1180-81 (3d Cir. 1979). We are precluded from reversing on this ground, however, because Forstater's counsel did not object to the instruction before the jury retired to consider its verdict. Fed.R.Civ.P. 51.[25]
 
 
 84
 Forstater's alternative argument is entirely without merit. Tose testified that it was not his habit to read documents that Forstater presented for his signature "word for word," and that he did not read the letter at issue before he signed it. Joint App. at 303. Forstater attacks this testimony as "perjury" and "lies." Brief for Appellant Forstater at 33. He offers no other argument. This is inadequate. Issues of credibility are properly left to the jury, and the jury answered this issue in favor of Tose.
 
 X.
 
 85
 The judgments appealed from will be affirmed in all respects. Costs taxed against appellants and cross-appellants.
 
 
 
 *
 Honorable Howard T. Markey, of the United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Counts one and four alleged violations of both § 1 and § 2 of the Sherman Act. Appellants do not press the § 2 claim on appeal, and we find no evidence in the record to support a finding of monopolization
 
 
 [2]
 Forstater's motions were filed on July 16 and denied on August 8, 1980. Appellants filed their notice of appeal on July 24, 1980. Appellees have moved to dismiss the appeal for want of jurisdiction, contending that the appeal is barred by F.R.A.P. 4(a)(4), which provides that "the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying" a motion for judgment n.o.v. The 1979 amendments to Rule 4(a) provide that "(a) notice of appeal filed before the disposition of any of the above motions shall have no effect."
 Appellants plainly failed to satisfy the demands of Rule 4(a). We are reluctant to treat the default as jurisdictional, however, in light of the substantial forfeiture that would result and the absence of any prejudice to appellees resulting from the premature filing. As Judge Van Dusen wrote for the court in Hodge v. Hodge, 507 F.2d 87, 89 (3d Cir. 1975), "(s)o long as the order is an appealable one and the non-appealing party is not prejudiced by the prematurity the court of appeals should proceed to decide the case on the merits rather than dismiss on the basis of such a technicality." We have discretion under Appellate Rule 2 to "suspend the requirements or provisions of any of these rules in a particular case on (our) own motion," and we exercise our discretion to waive the Rule 4(a) default in this case. We do so "to relieve litigants of the consequences of default where manifest injustice would otherwise result." Note of Advisory Committee on Appellate Rules, 28 U.S.C.A. following Rule 2. We note also that Forstater's motions could not have led to alteration of the judgments appealed from. See id. following Rule 4 (1979 Amendment, Note to Subdivision (a)(4)).
 
 
 [3]
 Forstater, a certified public accountant since 1950, had been a full-time employee of Tose and his various enterprises from 1966 to 1976. He left that position sometime in 1976 to "go into the consulting business." 4 App. 1012, but he continued to work part-time for the Eagles
 
 
 [4]
 Appellants describe the March 24 memorandum as "one of the most remarkable documents in the history of antitrust litigation." Brief for Appellants at 4. Appellee Pemberton, who first saw the memorandum on April 6, 1977, testified that he was "surprised" and "appalled." He stated that "in my mind it appeared to be an effort to be too tough on the borrower and it appeared as if the only way that he could comply with what I consider to be the demands would be to sell the club." 7 App. 1615
 
 
 [5]
 Hayes' March 17 memorandum recommended that Forstater be designated for this position, but Bunting instructed Hayes not to name Forstater in his second draft because he thought Forstater "was working with Tose and (was) his best friend." 9 App. 2203
 
 
 [6]
 Rome explained at trial that he did not want Barness to learn that FPB was planning to lend Tose money to purchase Barness' interest because he was concerned that Barness would then "increase his demand as to a purchase price." 10 App. 2474
 
 
 [7]
 Bunting also stated that he intended to ignore a written commitment to lend to the Eagles $1.25 million in receipts from advance ticket sales, which had been paid to the bank to reduce the principal of the loan and thereby to reduce interest payments. The bank had agreed to relend the ticket money for the Eagles' operating expenses. See 2 App. 288-89. Appellants state that if FPB had breached this agreement, "all Eagles checks, beginning the next day and including payroll checks to be issued the following Monday, would (have) bounce(d)." Brief for Appellants at 3
 
 
 [8]
 Kline testified that on December 9 Tose indicated that he "had a commitment at that time for refinancing," and that he wished Tose well and stated that "if for any reason he should want to come back to Provident" the bank would be willing to reopen discussions. 12 App. 3165-66
 
 
 [9]
 Appellants contend that at the end of the meeting a Chase vice-president "said they had a deal, shook hands with Tose, among others, and toasted the agreement with champagne." Brief for Appellants at 14, citing 3 App. 666-67. The evidence cited does not support this contention, and we have not discovered any other evidence in the record to provide support
 
 
 [10]
 The principal obstacles identified by Chase's attorneys related to Barness' right of first refusal to acquire Tose's interest in the Eagles, which would inhibit the marketability of Tose's interest if the bank had to foreclose, and ambiguities in the partnership agreement regarding transfer of the general partnership interest and appointment of a successor general partner. Counsel also referred to lawsuits filed against Tose by Barness and Firestone, the necessity for Interstate Commerce Commission approval of a promissory note to be given by Tose, Inc. (a trucking company), the requirement that the City of Philadelphia consent to assignment of the Eagles' stadium lease as security for the loan, the fact that the NFL's television contracts which were to be assigned as security were not yet in existence, and Tose's wife's dower interest in real property which was to be mortgaged as part of the loan package. See 2 App. 493-96, 3 App. 505, 507, 509-13, 516-19, 522-26, 531
 
 
 [11]
 This announcement followed a private conference of the Chase representatives. One Chase officer "wanted to go ahead and try to make it work" but another wanted the application to "die" because it was "causing too much trouble." 3 App. 520. The second officer concluded the private discussions by saying, "As it stands right now, we are not prepared to make this loan. However, if you feel so strongly about it, if you can button it all up and make me happy, that (counsel) is happy, then we can talk about it again." Id
 
 
 [12]
 St. Clair testified that he could not recall why he agreed to discuss the application with Duffy after twice refusing to consider Eagles' applications. 3 App. 706, 709-10
 
 
 [13]
 St. Clair met informally with three Girard officers on Friday, February 3, shortly before he departed for New York, and at least two advised him "not to make the loan because it wasn't worthwhile all the aggravation that would occur." 14 App. 3737. One of the three testified that he "had no enthusiasm for the proposal" because "(o)ver a long period of years, Mr. Tose had developed, I think, a high degree of notoriety. He appeared to me to be a contentious person and I was just not interested in considering a loan." Id. 3601. He was also unimpressed by financial statements and projections submitted by Duffy
 
 
 [14]
 The district court scheduled a trifurcated trial, liability, damages and counterclaims, but omitted the trial on damages after granting judgment to defendants on all of appellants' claims
 
 
 [15]
 Count four alleges a conspiracy to fix prices interest rates charged on bank loans in violation of § 1. We deal with count four separately, in Part VI. of this opinion
 
 
 [16]
 Reiter v. Sonotone Corp., 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), and Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), are not to the contrary. Reiter held that a consumer who pays a higher price for personal goods as a result of an antitrust violation (a conspiracy to fix prices) may sue under § 4 of the Clayton Act, which provides a treble damages remedy for "(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." (The court of appeals had held that § 4 only authorizes relief for injuries of a commercial or business nature.) Klor's disapproved of the so-called "public wrong doctrine," holding that a single retailer may obtain relief for an antitrust violation (a group boycott instigated by a competing seller) even if the public is not denied the opportunity to buy in a competitive market. The question of violation was not an issue in Reiter or Klor's. Each plaintiff alleged conduct that had previously been designated illegal per se due to its anticompetitive effects. The plaintiff in Klor's was denied the ability to compete for retail sales. The plaintiff in Reiter was charged a higher price for goods because her seller had agreed with his competitors not to engage in price competition. Tose, by contrast, asserts only that he was damaged by a conspiracy between his banker and his limited partner to force him to sell his share of the partnership. Without proof that the alleged conspiracy was intended or likely to affect competition, and therefore "forbidden in the antitrust laws," he cannot obtain relief under § 4
 
 
 [17]
 Our cases make clear that proof of anticompetitive impact or intent is a necessary element of a prima facie case under the rule of reason. See, e. g., Franklin Music Co. v. American Broadcasting Co., Inc., 616 F.2d 528, 541-42 (3d Cir. 1979) (Gibbons, J., announcing decision of the court); id. at 553-56 (Sloviter, J., concurring in part); Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440, 448 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978); Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 81 (3d Cir. 1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Cf. Brunswick, 429 U.S. at 489, 97 S.Ct. at 697 (plaintiff must prove "antitrust injury")
 
 
 [19]
 Barness also contacted Chase about the loans, but not until after Chase had rejected the applications and communicated its decision to Tose. Thus, the Barness contact adds nothing to the case against Chase
 
 
 [20]
 Not every pricing agreement between businesses is subject to the per se rule of illegality established in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), and United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). The Supreme Court has recognized that cooperation among businesses in some situations is pro-competitive, and therefore in accord with the purposes of federal antitrust law, because two or more businesses acting together can achieve desirable ends that an individual business cannot. As the Court noted in Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 23, 99 S.Ct. 1551, 1564, 60 L.Ed.2d 1 (1979), "(j)oint ventures and other cooperative arrangements are not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." Joint lending arrangements provide support for a vigorous economy by making possible large extensions of credit beyond the capacity of any single bank. Cf. United States v. Morgan, 118 F.Supp. 621 (S.D.N.Y.1953) (system of syndicated underwriting of new securities to be sold at a fixed price schedule held a reasonable business combination with the purpose and effect of efficiently promoting trade); see generally United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). We recognize that appellants do not attack participating loans, but only the practice of following the lead bank's prime rate, as illegal per se. It may be that the record would preclude summary judgment if appellants had standing to raise this claim, because of a genuine factual question whether "the agreement on price is necessary to market the product at all." Broadcast Music, 441 U.S. at 23, 99 S.Ct. at 1564. Because of the view we take, however, we need not reach that question
 
 
 [21]
 See, e. g., Weit v. Continental Illinois National Bank, 641 F.2d 457 (7th Cir. 1981). In an opinion affirming a summary judgment for defendants on charges of a bankers' conspiracy to fix the interest rate on bank credit cards at 18% per annum, the court "noted that parallel pricing or conduct lacks probative significance when the product in question is standardized or fungible," id. at 463 (citations omitted), and continued: "In the instant case, the product in question is consumer credit, or more fundamentally, the cost of borrowing money for a given period. The underlying product money is not only fungible, it is by definition an interchangeable medium of exchange." Id. See generally Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 665 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); United States v. FMC Corp., 306 F.Supp. 1106, 1139 (E.D.Pa.1969) (Higginbotham, J.)
 
 
 [22]
 Conspiracy is not an element of a § 1972(1)(C) violation
 
 
 [23]
 We affirm the judgment in favor of Bunting and Pemberton for an additional reason. Section 1972(1) provides that "(a) bank shall not" engage in certain conduct, but it does not forbid individual conduct. The term "bank" is defined in § 1971, incorporating the definition found in § 1841(c) of the same title, as an "institution ...." Further, § 1972(2)(F) expressly forbids certain individual conduct, which leads us to infer that Congress deliberately limited § 1972(1) to banks. Therefore, Bunting and Pemberton could not in any event be held liable for a violation of § 1972(1)(C)
 
 
 [24]
 The Supreme Court of Pennsylvania has frequently adopted sections of the Restatement (Second) of Torts as Pennsylvania common law when its "common-law precedents varied from the Restatement or when the Pennsylvania common law provided no answer." Gilbert v. Korvette's, Inc., 457 Pa. 602, 611-12 n.25, 327 A.2d 94, 100 n.25 (1974) (citations omitted). The Court looked to Restatement (Second) §§ 766, 766B, and 767 in establishing rules of liability for interference with existing or prospective contractual relations in Thompson Coal, 488 Pa. at 207-08, 412 A.2d at 470, and in Adler, Barish, 482 Pa. at 430-34, 393 A.2d at 1183-84. We believe that if it were presented with the question the Court would adopt the ancillary rules stated in §§ 774A and 47 as Pennsylvania common law, so we look to those sections in fashioning rules for decision of this case
 
 
 [25]
 We note that Tose requested the court to instruct the jury regarding the existence and effect of a confidential relationship between the parties. See generally Young v. Kaye, 443 Pa. 335, 342-43, 279 A.2d 759, 763 (1971). Forstater did not join in this request, however, and so he may not assign error to its refusal